## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BRENDA L. DANIEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:16-cv-1919-CLS** |
| | ) | |
| **HUNTSVILLE CITY BOARD** | ) | |
| **OF EDUCATION,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff, Brenda Daniel, a former employee of the Huntsville City Board of Education ("the Board"), asserts that she was subjected to unlawful race discrimination, retaliation, and a racially hostile work environment, and she seeks redress for those alleged wrongs pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1983. The defendants to her claims are the Board; Eugene C. "Casey" Wardynski, the former Superintendent, who is sued in his individual capacity; and Presonia Lynette Alexander, the former Principal of Westlawn Middle School, who is sued in her individual capacity. Plaintiff also asserts pursuant to 28 U.S.C. § 1367(a) a supplemental state law claim against defendant Alexander for tortious interference with her business relationship with the Board.[1] The case currently is before the court

---

[1] *See* doc. no. 1 (Complaint). Plaintiff asserts her § 1981 claims "by and through" 42 U.S.C. § 1983. *See, e.g., id.* ¶ 1. *See also Butts v. County of Volusia*, 222 F.3d 891, 892 (11th Cir. 2000)

on motions for summary judgment filed by the Board,[2] Alexander,[3] and Wardynski.[4] Upon consideration of the briefs and evidentiary submissions, the court concludes that all motions for summary judgment are due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-

---

(holding that "§ 1983 contains the sole cause of action against state actors for violations of § 1981"). Plaintiff's complaint originally also asserted her federal claims against the individual members of the Board, in their respective individual capacities, but those claims were dismissed on April 6, 2017. *See* doc. no. 20.

[2] Doc. no. 28 (Board's Motion for Summary Judgment).

[3] Doc. no. 31 (Alexander's Motion for Summary Judgment).

[4] Doc. no. 33 (Wardynski's Motion for Summary Judgment).

moving party are not unqualified, however. "[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

### A.    Plaintiff's Employment at Westlawn Middle School

Plaintiff, Brenda L. Daniel,  is a white female. She applied for a teaching position with the Huntsville City School System during the summer of 2014.[5] She was hired to replace a seventh grade math teacher at Westlawn Middle School during

---

[5] Doc. no. 30-1 (Deposition of Brenda Daniel), at 38-39.

August of that same year.[6]  A review committee selected three applicants to interview for the position, and defendant Lynette Alexander, the black female Principal of Westlawn, conducted in-person interviews of each applicant.[7]  Principal Alexander recommended plaintiff for hire, and the Board approved the selection.[8]  Plaintiff began teaching at Westlawn on August 25, 2014, three weeks after the 2014-15 school year had begun.[9]

During the 2014-15 school year, Westlawn was characterized as a "turn-around school," meaning that its test scores had been in the bottom ten percent of the State, and the school had received a five-million-dollar federal School Improvement Grant to help turn the school around.[10]  As part of those efforts, eighty percent of the school faculty had been changed during the 2012-13 school year.  The Board also was required to hire consultants to train teachers on discipline plans, strategic planning, following lesson plans, and other classroom issues.[11]

Plaintiff signed an agreement on October 16, 2014, to provide "Extended Learning Time" tutorial services in addition to her regular classroom teaching duties.

---

[6] Doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 7.

[7] Doc. no. 30-4 (Deposition of Casey Wardynski), at 19-20; doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), at ¶ 7; doc. no. 30-1 (Deposition of Brenda Daniel), at 40-41.

[8] Doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 7.

[9] *Id.*

[10] *Id.*, ¶ 3.

[11] *Id.*, ¶ 5.

Micah Fisher, the Human Resources Manager, also signed the agreement on behalf

of the Board.  The agreement stated:

>      WHEREAS, the undersigned Brenda Daniel (hereinafter
> "Daniel") is employed with the Huntsville City Board of Education
> (hereinafter "Board"); and

>      WHEREAS, Daniel has temporarily been assigned by the Board
> to serve during Extended Learning Time at Westlawn Middle School
> from August 26, 2014, through May 27, 2017; and

>      WHEREAS, in such position, Daniel shall work no more than 5
> hours per week and shall be paid at a rate of $27.10 per hour, payable on
> a monthly basis upon receipt of properly authorized timesheets which
> are due on the same date as Payroll Service Reports; and

>      WHEREAS, the funds shall be made available from Federal
> Funds.

>      NOW, THEREFORE, the parties hereto agree as follows:

> 1.    During the period of time Daniel serves during Extended
>       Learning Time at Westlawn Middle School, Daniel shall be
>       paid at a rate of $27.10 per hour.

> 2.    The parties hereto understand and agree that Daniel's
>       temporary assignment will end at the appropriate date as
>       indicated in this agreement.

> 3.    *This agreement may be terminated upon five (5) days
>       written notification by either party.*

Doc. no. 47-9 (Agreement) (emphasis supplied).

**B.      Plaintiff's Allegations of Mistreatment by Principal Alexander**

Plaintiff testified that Principal Alexander treated her "favorite teachers" more favorably than others, including plaintiff. Principal Alexander did not yell at her "favorites," humiliate them, or "write them up" for disciplinary infractions. Principal Alexander's "favorites" included both white and black teachers, and most were teachers who had been assigned to Westlawn through the "Teach for America" program. A group of teachers had complained the previous year to Superintendent Casey Wardynski, a white male, about Principal Alexander's behavior, and plaintiff began to suspect that Principal Alexander treated those teachers more favorably so she would not be the subject of any further complaints.[12]

Plaintiff also alleges that Principal Alexander treated her unfavorably because of her race. She never heard Principal Alexander make any racially derogatory comments, however.[13] Instead, she contends that Principal Alexander's written reprimands and other reactions to plaintiff's job performance demonstrated a racial bias.

### 1. Plaintiff's interactions with an educational vendor

Kristy Hill, a consultant from an educational vendor known as "Pearson Education," met with Westlawn's seventh and eighth grade teachers on September

---

[12] Doc. no. 30-1 (Deposition of Brenda Daniel), at 56-60.

[13] *Id.* at 300.

23, 2014.  Hill asked the teachers for their opinions on the math curriculum provided

by Pearson, and plaintiff responded that she thought the curriculum was not user-

friendly and did not cover the material with sufficient depth.  Plaintiff characterized

her interaction with Hill as professional and courteous, and she testified that Hill

thanked her and other teachers for their comments after the meeting.[14]  Even so, Hill

informed someone working at the Board's central office that a teacher had been

confrontational during the meeting, and the Board employee in turn informed

Principal Alexander.  Principal Alexander identified plaintiff as the teacher about

whom Hill had complained and sent plaintiff an email the same day as the meeting,

stating:

> I am concerned after some of the comments shared during the
> Pearson training today.  Whether or not to use Pearson daily is not an
> option.   Pearson is a district initiative which must be used and
> implemented!
>
> We are here to support your instructional efforts but your success
> is going to also depend on your commitment to the classroom
> management plan and your effective implementation of the curriculum.
> Please let the Westlawn staff know if you need any assistance not the
> Pearson reps!  Feel free to let me know if I can assistance you [*sic*] in
> any way.

Doc. no. 30-2, at ECF 4 (September 23, 2014 email).  Plaintiff responded the

following morning by stating:

---

[14] *Id.* at 71-72; doc. no. 47-1 (Declaration of Brenda L. Daniel), ¶ 7.

I told the Pearson rep that I didn't use schoolnet every day because I can't count on the internet. I also told her that I use the snapshot tool from Promethean to copy the material from digits into a flipchart.[15] Everything taught in my class is from digits and occasionally I have to supplement the material. I told her I am not a fan of digits and I have used Pearson for the past 5 years and I do not feel this curriculum is student friendly.

If you would like to see any of my flipcharts please let me know and I will print them off for your review.

*Id.* Principal Alexander replied, at a date and time that cannot be discerned from the record:

The use of Pearson is NOT an option! It is the curriculum adopted by Huntsville City Schools. It does not benefit anyone to share your dislike or feelings with the Pearson Reps. She is tasked with training teachers not selling the program. Please save your candid concerns for your Westlawn family members so [we] can try to help you resolve problems internally.

Please let us know how we can help!

*Id.* (alteration supplied). Principal Alexander testified that she did not intend her emails to plaintiff to be disciplinary in nature, and she did not include copies in plaintiff's personnel file.[16]

On September 26, 2014, three days after the meeting in which plaintiff made comments about Pearson's math curriculum to Kristy Hill, Ms. Hill sent an email to

---

[15] Although it is not clear from the record, "schoolnet" and "digits" apparently are aspects of the Pearson program.

[16] Doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 8.

plaintiff, stating:

> Thank you for allowing me to observe your class. I felt you did a very good job explaining the concepts to the students in a way they can relate to their everyday life. The students respond well to you. It was smart to make a flip chart with the digits content due to internet issues this week. You seem to have a good handle on the material and math principles.

Doc. no. 30-3, at ECF 56 (September 26, 2014 email).

## 2. Teacher development meeting

On the same date that plaintiff received the foregoing email from Kristy Hill (September 26, 2014), Principal Alexander conducted a teacher development meeting at Westlawn. She showed a video of the story of "Ferdinand the Bull"[17] to the entire faculty, and stated in a mocking manner that certain teachers were only there to draw paychecks and would be fired at the end of the year. She threw pieces of paper around the room that supposedly depicted the teachers who would lose their jobs at the end of the year. She also brought a dozen roses into the meeting room and "would ease over and smell those roses because supposedly . . . some of us were there only to smell the roses . . . ."[18] Alexander did not mention the names of any specific teachers, but she employed a "hostile and degrading tone" when speaking, and

---

[17] Ferdinand the Bull is the titular character of the children's book *The Story of Ferdinand*, which "tells the story of a bull who would rather smell flowers than fight in bullfights. He sits in the middle of the bull ring failing to take heed of any of the provocations of the matador and others to fight." https://en.wikipedia.org/wiki/The_Story_of_Ferdinand, *last visited* April 5, 2018.

[18] Doc. no. 30-1 (Deposition of Brenda Daniel), at 61-62 (ellipsis supplied).

plaintiff felt humiliated and degraded.[19]  Alexander testified that she gave a similar speech to her faculty each year because Westlawn was a "turnaround school," and she wanted to convey a sense of urgency to the staff.[20]

Immediately after the conclusion of the teacher development meeting, plaintiff was called into a private meeting with Principal Alexander, Vice Principal Amy Van Allen (who is white), Luke Bergeson (a Teacher on Special Assignment, who is white), and the Turnaround Coach Melissa Smith, who is white.[21]  Plaintiff was handed an "Immediate Action Form" bearing that day's date, and stating, "During observation held on 9/26/14, the following instructional component(s) were NOT evident and corrective actions must be taken immediately."[22]  No boxes were checked under the categories labeled "Lesson Planning/Instruction," "Use of Strategies," or "Classroom Structures," but under the category of "Discipline" boxes were checked for "follow the 5-Step Discipline Plan" and "Consequences and Rewards for Adherence of Classroom Rules and Procedures."[23]  Under the heading "Effective Use

---

[19] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 9; doc. no. 30-1 (Deposition of Brenda Daniel), at 62.

[20] Doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 9.

[21] Doc. no. 30-1 (Deposition of Brenda Daniel), at 42-44, 48, 62-68.  A Teacher on Special Assignment is "assigned to schools to help principals perform administrative duties."  Doc. no. 30-12 (Affidavit of Luke Bergeson), ¶ 3.  Principal Alexander acknowledged that Bergeson did not have an administrative certificate, but he was in training to be an administrator.  Doc. no. 30-3 (Deposition of Presonia Lynette Alexander), at 34-35.

[22] Doc. no. 30-2, at ECF 2-3.

[23] Id.

of Time," boxes were checked for "Bell to Bell Instruction," "Move Around the Room to Ensure Students Are On Task," and "Monitor the Effective Use of Technology."[24]  In closing, the form stated:

> The above checked item(s) have been noted and must be addressed immediately.  The Administrative Staff and Instructional Partners are available to assist you.  However, your unwillingness to correct these essential instructional components expeditiously will result in the placement of a letter documenting in your action [*sic*] in your HCS [*i.e.,* Huntsville City Schools] Human Resource file.
>
> Remember, Student Growth is our business!

Doc. no. 30-2, at ECF 2-3 (alteration supplied).  The letter was jointly signed by Principal Alexander, Amelia ("Amy") Van Allen, and Luke Bergeson as the "Westlawn Administrative Staff."[25]

During the meeting at which the Immediate Action Form was discussed, Principal Alexander told plaintiff that she "had people" in plaintiff's classroom, and it had been determined by those "people" that plaintiff did not know her curriculum.[26] When plaintiff asked for the identities of those persons who allegedly had been in her classroom as observers, Principal Alexander "violently threw her hand in [plaintiff's] face," causing plaintiff to believe that she would be slapped, and said to plaintiff:

---

[24] *Id.* at ECF 3.

[25] *Id.*

[26] Doc. no. 30-1 (Deposition of Brenda Daniel), at 66.

"'We are not going to talk about other teachers.'"[27] Plaintiff grew concerned that she would be fired because Principal Alexander had just referenced firing teachers in the teacher development meeting that preceded the private meeting, and the form discussed in the subsequent private meeting referenced "immediate action." Even so, she could not recall anything else that occurred during the private meeting with the "Westlawn Administrative Staff."[28] Despite Principal Alexander's assertion that plaintiff's classroom behavior had been observed by unidentified "people," plaintiff testified that no administrators had observed, or even been present in her classroom, before September 26.[29]

Although plaintiff was the first teacher to meet privately with the "Westlawn Administrative Staff," other teachers met individually with Principal Alexander, Vice Principal Amy Van Allen, Luke Bergeson, and Melissa Smith on September 26. Even so, plaintiff only heard the names of two other teachers being called to their meetings over the public address system, and both of those teachers were white.[30] Despite that assertion, Principal Alexander testified that she met with both white and black teachers on September 26 "to review classroom observation checklists and discuss

---

[27] *Id.* at 66-67 (alteration supplied).

[28] *Id.* at 67-69.

[29] *Id.* at 68; doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 10.

[30] Doc. no. 30-1 (Deposition of Brenda Daniel), at 64; doc. no. 47-1 (Declaration of Brenda Daniel, ¶ 11.

items identified as needing immediate action."[31]   The meetings and observation checklists "were not disciplinary, but rather, intended to help teachers improve."[32]

### 3.   Plaintiff leaves her classroom

Of approximately twenty-four students in plaintiff's Westlawn classroom, ten to fourteen possessed "Warriors on Watch" (WOW) cards, meaning that they had documented disciplinary problems.  The class had started the school year behind in their studies, because the substitute teacher who had been managing the classroom prior to the date on which plaintiff began teaching at Westlawn (August 25, 2014) had not progressed the curriculum.  Plaintiff was having trouble maintaining order in the classroom and catching up the curriculum, and she had asked both Vice Principal Amy Van Allen and Teacher on Special Assignment Luke Bergeson for help, but she did not receive any assistance.   Plaintiff became so frustrated with student misbehavior and lack of order in her classroom that, on October 16, 2014, she began to cry, left her classroom, walked to Mr. Bergeson's office, and said:  "You're going to have to get me a sub because I've got to go home because I can't handle this today."[33]   Bergeson asked Crystal Alexander, the Curriculum Coach, to cover

---

[31] Doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 9.

[32] *Id.*

[33] Doc. no. 30-1 (Deposition of Brenda Daniel), at 94-95.  Bergeson testified that plaintiff said, "you can do whatever you need to with the class but I am leaving."  Doc. no. 30-12 (Affidavit of Luke Bergeson), ¶ 6.  At this summary judgment stage, however, the court must accept plaintiff's version of her comment as being true.

plaintiff's classroom.[34]  Plaintiff sat in her car crying for an undisclosed period of time, then called Vice Principal Amy Van Allen, who asked her to come back inside the school.  Plaintiff complied, then talked to Van Allen, who listened to plaintiff's concerns, acknowledged there were too many students in the class with disciplinary problems, and promised to help plaintiff.[35]

Principal Alexander sent plaintiff a letter on October 22, 2014, stating:

This letter is to express my concern regarding you leaving your class unattended on Thursday, October 16, 2014.  According to the office staff, you entered the front office and abruptly stated, "You could do whatever we needed to with the class, but I am leaving."  You then proceeded out the front door abandoning your second period class.

You decided to return to the building and a conference was held with our Director of Instruction, the TOSA [*i.e.,* Teacher on Special Assignment] and myself.  I expressed my expectations regarding full implementation of the school-wide discipline plan and your solicitation of help from the administrative team as needed when dealing [with] disciplinary measures.  The leadership team has made efforts to support the implementation of your classroom management plan through coaching, observations, reflective feedback, professional development and team level support.

Abandoning your classroom during the instructional day is unacceptable.  As teachers, we must make every attempt to develop positive relationships with students and how to respond to disruptive behaviors in a reasonable, proactive manner.  Classroom teachers must possess the ability to communicate effectively, in order to have a positive influence on the overall school climate.

---

[34] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶¶ 12, 14.

[35] *Id.*, ¶ 13; doc. no. 30-1 (Deposition of Brenda Daniel), at 96.

You are expected to understand the importance of your role in changing Westlawn's culture to that of an exemplary school.

This letter will be placed in your Human Resource file.

Doc. no. 30-2 (October 22, 2014 Letter) (alterations supplied).

Plaintiff acknowledged that no adult was physically present in her classroom from the time she walked out until the time that Luke Bergeson sent Crystal Alexander to cover the classroom, but she did leave the classroom door open, and the teacher in the classroom across the hall was watching out for the classroom.[36]

**4.     October 21, 2014 walkthrough**

Luke Bergeson and Crystal Alexander conducted a walkthrough observation of plaintiff's classroom on October 21, 2014.  They reported their observations to Principal Alexander, who issued the following letter to plaintiff on October 22, 2014:

During the weekly walkthrough held on Tuesday, October 21, 2014, the following classroom structures were noted:

1.     **Focus Wall** did not match activity or lesson plan

2.     **Student Trackers** were not current or complete  (*No Pre-Assessment Data for October*)

3.     **Student Work** was current and up-to-date

4.     No evidence of consistency with **Classroom Behavior Plan**

_____

[36] Doc. no. 30-1 (Deposition of Brenda Daniel), at 97.

5. **Current Lesson Plans** were not available in notebook

6. **Daily Lesson Plans** duplicated over several days

7. **Student Work** displayed is below grade (*Example: Color by number division worksheet*)

Due to being a "Turnaround School," we must place all of our effort on the academic needs of our students. Classroom instructional time must be targeted and focused on assisting students as they work to obtain necessary academic skills. The leadership team has made efforts to support the implementation of your classroom management plan through coaching, observations, reflective feedback, professional development and team level support.

It is your professional responsibility to be prepared for instruction daily. Planning for effective classroom instruction creates a structured learning environment for all students. Lesson plans, discipline plans and a tardy log are an integral [part] of the School Improvement Grant (SIG) and will be used as documentation for instructional accountability. Teachers will be held liable for the mastery of presented objectives and the day-to-day instruction in their classroom.

You are expected to implement all the aspects of the classroom structures, which have been established, as school norms and expectations for Westlawn Teachers. This letter will be placed in your Westlawn Middle School personnel file. If this behavior continues, documentation will be placed in your Human Resource file.

Doc. no. 30-2, at ECF 5 (October 22, 2014 Letter) (alteration supplied, all emphasis in original).

Plaintiff disputes that most of the problems noted in the foregoing letter were accurate. She explained that all classroom structure materials, including student trackers, Focus Wall items, and student work display items, had been removed from

her classroom because the room had been used earlier that morning to administer testing required by the Board.[37]  She also explained that math teachers compiled student trackers based on unit completion, not on a monthly basis, so it was wrong to criticize her for not having pre-assessment data for the month of October.[38]  She stated that, if she had not been following the classroom behavior plan, it was because she had not been trained on the plan.[39]  She disputed that current lesson plans were unavailable, and asserted that the plan for the day of the observation simply was not on top of the notebook, and she explained that math lesson plans often were duplicated because the material had to be covered multiple times in order to ensure students' understanding.[40]  Finally, she explained that the student work displayed was below grade level because the students were struggling with a foundational concept, and she could not move on to more challenging topics until that concept had been mastered.[41]

### 5. Crystal Alexander's observation of plaintiff's classroom

One week later, on October 28, 2014, Crystal Alexander, the Curriculum Coach, entered plaintiff's classroom during instructional time in order to collect data

---

[37] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 17.

[38] Doc. no. 30-1 (Deposition of Brenda Daniel), at 85.

[39] *Id.* at 86.

[40] *Id.* at 88-89.

[41] *Id.* at 89-90.

for the turn-around program. Plaintiff continued teaching, but Ms. Alexander called her aside to ask some questions. Plaintiff attempted to respond in a low tone because she did not want the students to hear what was being said, and Ms. Alexander asked plaintiff to step outside to continue the conversation. Alexander accused plaintiff of being defensive, and plaintiff responded, "I got to teach my class," because she believed teaching was the most important thing.[42] Alexander asked plaintiff if she wanted to go see Mr. Bergeson, the Teacher on Special Assignment, but plaintiff declined, responding that she had a class to teach.[43]

Plaintiff denies being aggressive or confrontational during her exchange with Crystal Alexander,[44] but Ms. Alexander reported to Principal Alexander that plaintiff was both aggressive and unprofessional, and that she yelled and cursed in the presence of students.[45] As a result, Principal Alexander wrote the following letter to plaintiff on October 29, 2014:

> This letter is to express my concern regarding your unprofessional tone and resistance to the coaching support. On Tuesday, October 28, 2014, the Assistant Principal, TOSA and Instructional Partner were asked to conduct a walkthrough in each class in preparation for a visit by the Mayor and District officials. A checklist was created to inform teachers of their need to address the classroom structures and norms such as focus walls, lesson plans current and available, and word wall.

---

[42] *Id.* at 120-21.

[43] *Id.* at 121.

[44] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 15.

[45] Doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 11.

The Instructional Partner [Crystal Alexander, who also is sometimes referred to as "Curriculum Coach"] arrived in your classroom to complete the checklist and you became both aggressive and confrontational. Due to your mannerism, voice tone, and the presence of students at the time in the classroom, she asked you to step outside. While outside the classroom, you continued to express your concerns about the Instructional Partner's inaccurate recollection and report of classroom structures during the walkthrough last week. You implied that you were written up because of these inaccuracies and that the (leadership team) was not good at recognizing and admitted their mistakes. Because the Instructional Coach was bewildered and insulted by your tone and aggressiveness, she reported this incident to the Assistant Principal and a meeting was held to address [the] incident. During this meeting, the role and support of the Instructional Partner was reiterated.

Your tone toward the Instructional Partner was unprofessional and provides evidence of your ongoing resistance to the coaching process. Your unwelcoming response to the classroom visit by members of the Leadership Team is unacceptable. Your classroom should be welcoming, open and a haven for improvement of best teaching practices. Moreover, the time to express concerns regarding walkthroughs was during the Walkthrough/Follow-up/Feedback meeting, not in the middle of your classroom.

The Leadership Team has made numerous attempts to express the importance of your participation in the process to become a Professional Learning Community. Westlawn Middle will conduct weekly walkthroughs, schedule daily job-embedded professional development, model for teachers, facilitate team collaboration, participate in the coaching process and conduct data analysis. We expect full participation of all teachers as we implement sound instructional practices and the Instructional Partner is expect[ed] to support the classroom teacher in those efforts.

This letter will be placed in your Human Reource file.

Doc. no. 30-2, at ECF 10-11 (October 29, 2014 Letter) (alterations supplied).

## 6.    Student reassignments

On that same date, October 29, 2014, Assistant Principal Amy Van Allen and Teacher on Special Assignment Luke Bergeson expressed concern to Principal Alexander that plaintiff was not providing some students a fair opportunity to participate in the learning process.  Principal Alexander also received requests from parents and students that certain students be removed from plaintiff's classroom. Principal Alexander agreed that it was in those students' best interest to be removed from plaintiff's classroom,[46] and she sent the following letter on that same date:

> The letter is to express my concern regarding schedule changes to remove students from your classes.  The Assistant Principal and TOSA expressed concerns about your willingness to give these students a fair opportunity to participate in the learning experiences in your classroom. After much deliberation, I decided a schedule change was in the best interest of the students.  On Monday, October 27, 2014, the second student was scheduled out of your classroom.  I continue to have students making verbal requests to be removed from your classroom.

> However, we cannot continue to move students out of your classroom.  You are expected to make every effort to develop relationships with students, consistently implement the classroom management plan, teach students where they are academically, provide a consistent, nurturing classroom environment and accept the suggestions for strategies and classroom environment offered by the Leadership Team.

> The letter will be placed in your Westlawn Middle School personnel file.  If this behavior continues, a letter will be placed in your Human Resource file at Central Office.

---

[46] *Id.*, ¶ 12.

Doc. no. 30-2, at ECF 9 (October 29, 2014 Letter).

Plaintiff was aware of only two students being removed from her classroom. The first was a female of unspecified race who consistently was reprimanded for failing to finish eating her breakfast on time. The girl brought a letter to school from her father stating that he was giving his permission, upon request from Principal Alexander, to move the girl to a different classroom. The second was a black male who caused trouble for all of his teachers. He bumped into plaintiff one time in the hallway, and he also used physical force to enter plaintiff's classroom after she had forbidden him to enter during non-instructional time. Plaintiff requested that the male student be removed from her classroom because she was afraid of him.[47]

### 7. Plaintiff's comments about a disabled student

While plaintiff was chaperoning a bowling trip for a group of students, she noticed that one female student smelled like urine. Because that student was in her class and she had smelled the urine odor before, plaintiff mentioned it to the school nurse, who also was chaperoning the trip. The nurse helped the student change clothes, and then asked plaintiff to suggest to the student that she visit the nurse at school if plaintiff smelled urine again. On a later date, December 1, 2014, plaintiff witnessed the same student squatting in the hallway to use the bathroom. She

---

[47] Doc. no. 30-1 (Deposition of Brenda Daniel), at 107-16; doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 23.

mentioned the student's situation to other teachers during a data meeting that afternoon, and suggested that the other teachers also send the student to the nurse if they ever smelled or observed urine.[48]  Plaintiff testified that she brought up the topic out of concern for the student.[49]

Principal Alexander wrote a letter to plaintiff regarding this situation on December 1, 2014, stating:

> This letter is to express my concern regarding your initiation of an inappropriate discussion regarding an incident with a student.  This discussion took place during our regularly scheduled Professional Learning Communities (PLC) meeting held on Monday, December 1st.  During this meeting, you abruptly asked an entire team of teachers if any of them witnessed this particular student pulling her pants down in the hallway and using the bathroom.  These comments were inappropriate, unnecessary and alerting to some of the teachers in attendance.

> It is my understanding that this child was experiencing some medical complications as she was leaving the clinic and you were leaving the bathroom in the same area.  The Security Officer and counselor were making efforts to assist getting the child back to the school nurse.  Your recollection of the incident as shared with the teachers was insensitive and purposeless.

> The discussion also posed no intent for help or solution for the child.  It was a non-solution oriented discussion.  If you had a true concern for the student's actions, you should have immediately reported the incident to the school administration, school nurse or school counselor.  Many of the teachers attending the PLC's did not have a "need to know" this information and do not know or teach this students [*sic*].

---

[48] Doc. no. 30-1 (Deposition of Brenda Daniel), at 144-47.

[49] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 16.

I expect teachers to be sensitive to the needs of individual students and seek help from other professionals in the building if a student seems to be in need of immediate assistance.

This letter will be placed in your Human Resource file.

Doc. no. 30-2 (December 1, 2014 Letter).

When plaintiff met with Principal Alexander to discuss this write-up, she was not allowed to explain the situation.[50]

## C.    Other Individuals' Assessments of Plaintiff's Performance

Dr. Shirley Kilgore, an independent behavioral consultant employed by the Education Company, had been hired by the Board to assess and assist teachers.  She observed the classrooms of several Westlawn teachers, including that of plaintiff, on November 19, 2014.   Afterwards, she discussed her findings with Westlawn's administrators.   The minutes of that meeting reflect that Dr. Kilgore made the following observations about plaintiff:

•    Huge disconnect with her [*sic*:   between plaintiff] and her students

•    You can tell she does not like her students

•    She is hostile and sarcastic

•    She met me at the door stating there were 24 on task and 14 on WOW cards

---

[50] Doc. no. 30-1 (Deposition of Brenda Daniel), at 147.

- Many [students] off task

- She chooses who to target

- No positive reinforcement

- She doesn't intervene / she reacts and attacks

- Her demeanor is not positive

- Anything we do for Daniel [plaintiff] is not going to help.

Doc. no. 30-14, at ECF 12-13 (Minutes of November 19, 2014 Meeting) (alterations supplied). Plaintiff denies that Dr. Kilgore made any of those negative statements. Plaintiff sated that she met with Dr. Kilgore after the classroom observation, and that Dr. Kilgore told her that she really knew how to keep her class under control.[51]

Plaintiff received mixed performance reviews from the Westlawn administrators. Principal Alexander never personally observed plaintiff's classroom, but she gave plaintiff an excellent score on a November 18, 2014 Student Trackers review.[52] On the other hand, Luke Bergeson, Crystal Alexander, and Amy Van Allen stated in their affidavits that students often complained about plaintiff, and that plaintiff exhibited poor classroom management.[53] Crystal Alexander and Amy Van

---

[51] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 21.

[52] *Id.*, ¶ 20; doc. no. 47-4 (November 18, 2014 Student Tracker Check).

[53] Doc. no. 30-12 (Affidavit of Luke Bergeson), ¶¶ 7-8; doc. no. 30-8 (Affidavit of Crystal Alexander), ¶ 7; doc. no. 30-10 (Affidavit of Amy Van Allen), ¶¶ 5-6. Plaintiff disputes that Luke Bergeson was an administrator, but the record reflects that Teachers on Special Assignment were assigned administrative duties. Doc. no. 30-12 (Affidavit of Luke Bergeson), ¶ 3; doc. no. 30-3

Allen also noted that plaintiff's classroom was chaotic and lacked structure, and that plaintiff yelled at and dismissed students from the class, as opposed to the preferable practice of building relationships with them.[54]  Despite having made such statements in her affidavit, however, Amy Van Allen stated on a December 2, 2014 "Educate Alabama" evaluation form that "several positive classroom management strategies were noted in [plaintiff's] classroom," despite the fact that the students in her class were "difficult."[55]

## D.  Plaintiff's Change in Assignment at Westlawn

Principal Alexander decided to change plaintiff's job assignment for her second semester at Westlawn, due to concerns over plaintiff's job performance and parent and student complaints.  She informed plaintiff on December 18, 2014, that she would be reassigned during the second semester as a math intervention teacher, rather than a classroom teacher.  The change in assignment did not affect plaintiff's salary or job location.[56]

Later that day, one of the students in plaintiff's class overheard Principal Alexander and the black school counselor laughing and bragging about plaintiff's

(Deposition of Presonia Lynette Alexander), at 34-35.

[54] Doc. no. 30-8 (Affidavit of Crystal Alexander), ¶ 7; doc. no. 30-10 (Affidavit of Amy Van Allen), ¶¶ 5-6.

[55] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 20 (alteration supplied).  The court could not locate a copy of the December 2, 2014 Educate Alabama evaluation in the record.

[56] Doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 15.

reassignment. That student shared what she had overheard with other students in the class, and the students and plaintiff all became upset. One student mentioned that they had been learning about defending their rights by studying in history class the civil rights marches that had occurred in Selma, Alabama. Without any encouragement from plaintiff, the students began making handwritten signs to protest plaintiff's reassignment.[57] The signs included messages like "Students will fight!"; "Fight for Ms. Daniels our math teacher!"; "Principals shouldn't harass teachers!"; "Protest 4 Mrs. Daniels"; and "Keep Mrs. Daniel. This will hurt you and the school."[58] The students did not miss any instructional time to make the signs. Moreover, the signs remained in plaintiff's classroom.[59]

One of plaintiff's students provided a written statement on December 19, 2014, stating:

> I came in and Mrs. daniels [*sic*] was crying & we asked her what's wrong and she asked us if we liked her as a math teacher and if we wanted to keep her. Our response was "yes," and she said we needed to have parents call and we needed to do something because Mrs. Alexander was harassing her and has been since she's gotten there. And today she said we needed to get a piece of paper and have everyone who wanted me "her" [*sic*] to stay, and she wrote "Keep Mrs. Daniels" on the paper and told me to tell my friends to sign it.

Doc. no. 30-2, at ECF 22 (December 19, 2014 Witness/Participant Statement).

---

[57] Doc. no. 30-1 (Deposition of Brenda Daniel), at 161-62.

[58] Doc. no. 30-2, at ECF 26-31 (Signs).

[59] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 24.

Another student provided a written statement on an unspecified date, stating:

> Ok i had just walked in the classroom then i saw Ms. Daniels
> crying and i was like whats wrong then everybody was like just leave
> her alone then they was like they finna [*sic*: "fixing to"] fire her then
> she said no they aren't firing me they taking all my math classes and we
> was like why then she was giving lots of things Alexander she said had
> done then she pulled out a pack of stuff Alexander had put on her. [*sic*]

Doc. no. 30-2, at ECF 23 (Witness/Participant Statement).[60]

Plaintiff denies encouraging the students to protest, or asserting that Principal

Alexander had mistreated her, or asking them to call the school on her behalf.[61]

Principal Alexander issued plaintiff a letter on December 19, 2014, stating:

> During our conference held on December 18, 2014, I shared
> numerous concerns regarding low student engagement, parent
> complaints, and classroom management. I also stated that an
> instructional change would occur at the beginning of the second
> semester. You would be reassigned additional Math intervention
> classes. My concerns regarding your resistance to professional growth
> and development was [*sic*] also expressed during this meeting.

> On December 19, 2014, the collaborative teacher assigned to your
> classroom informed me that you were promoting a student protest and
> your students were signing a petition in order to allow you to keep your
> job. The incident caused students to become involved in an
> unproductive, meaningless activity that served as a distractor from the
> necessary daily math instruction. These displays also left me feeling
> fearful and threatened. In my opinion, the student messages were
> personal and intimidating.

> The displays of approximately twenty-six signs were placed

---

[60] *See also* doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 16.

[61] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 24.

throughout the classroom with the following phrases:

1. Students Will Fight
2. Principals Should Not Harass Teachers
3. Keep Mrs. Daniel
4. Keep Ms. Daniel – This Will Hurt You and the School
5. Protest for Ms. Daniel

These displays left the collaborative teachers feeling unsettled and concerned about student safety. It is my understanding that conversations were intentionally held to influence student perceptions and opinions regarding you being fired and the anticipation that you would no longer serve as their teacher. Both of these assumptions are untrue.

Westlawn Middle School is a Turnaround School with high expectations for improvement; therefore, it is extremely important to commit all of our time and efforts toward academic excellence. During instructional time, students should be encouraged to focus on learning, not dealing with the degree to which the school is providing professional growth and development for their teachers. Any concerns regarding the administrative decision to make changes in scheduling should have been addressed during a meeting among adults.

Multiple efforts to provide coaching, mentoring and assistance have proving to be unproductive due to your resistance to change. In the future, I expect you to be receptive to professional feedback, make efforts to meet the individualized needs of students, maintain a student-focused academic learning environment and follow the classroom management plan.

This letter will be placed in your Human Resource file.

Doc. no. 30-2, at ECF 25 (December 19, 2014 Letter).

**E. Plaintiff's Transfer to Hampton Cove Middle School**

Plaintiff met with Shirley Wellington, her representative from the Alabama

-28-

Education Association ("AEA") and Pat Miller, her representative from the Huntsville Education Association ("HEA"), sometime during November of 2014. She told them that she had been harassed and humiliated, that she couldn't do anything right at work, and that she didn't know what to do about it.[62]  She specifically told Pat Miller that she believed she was being targeted by Principal Alexander because she was white.[63]  Plaintiffs's purpose in lodging those complaints with Wellington and Miller was to correct the write-ups she had received; she did not ask to be transferred to a different school.[64]  Even so, when Wellington and Miller met with Superintendent Casey Wardynski on plaintiff's behalf, they asked whether she could be transferred.  They represented that plaintiff was unhappy at Westlawn and had a personality conflict with Principal Alexander.  Wellington believed that plaintiff wanted the transfer, and thought "it would be beneficial for Brenda Daniel to get a fresh start at a new school."[65]

Superintendent Wardynski learned of an opening for a math teacher at Hampton Cove Middle School and approved plaintiff's transfer to that position.[66]

---

[62] Doc. no. 30-1 (Deposition of Brenda Daniel), at 138-39.

[63] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 25.

[64] *Id.*, ¶ 26.

[65] Doc. no. 30-5 (Affidavit of Shirley Wellington), ¶¶ 4-5.

[66] Doc. no. 30-4 (Deposition of Casey Wardynski), at 62; doc. no. 30-7 (Affidavit of Christie Finley), ¶ 7. Plaintiff states that Wardynski approved the transfer decision on January 8, 2015.  *See* doc. no. 46 (Plaintiff's Response in Opposition to Defendants' Motions for Summary Judgment), at 28, ¶ 3 ("Miser had received approval from Wardynski on January 8, 2015, to transfer Plaintiff

Christie Finley, the Board's Director of Secondary Programs, and Debi Miser, the Board's Talent Management Director, traveled to Westlawn to meet with plaintiff on January 9, 2015, to discuss the transfer.[67]  Plaintiff stated that she did not want to leave her students at Westlawn, but Finley told her it was time for her to be in a school where she was supported by her administrator.[68]  Plaintiff told Finley and Miser that she would sign the transfer agreement, but only if they could promise that her students would be taken care of, that they would not have a substitute teacher, and that she could call and check on the students whenever she wanted.  Finley agreed, and plaintiff signed the transfer document.[69]

Plaintiff did not want to transfer to Hampton Cove because, in addition to the reasons mentioned in the preceding paragraph, the transfer caused her to have a significantly longer commute, and to incur additional costs for day care and school transportation for her two children.[70]  Even so, plaintiff testified that she had a "wonderful experience" at Hampton Cove, and that she enjoyed working with the

---

to Hampton Cove Middle School."). There is no evidence to support that factual assertion, however. The document plaintiff cites as support is a January 8, 2015 email from Miser to Wardynski, requesting the transfer, but there is no indication of Wardynski's response.  *See* doc. no. 27-15 (January 8, 2015 email).

[67] Doc. no. 30-1 (Deposition of Brenda Daniel), at 189-90; doc. no. 30-7 (Affidavit of Christie Finley), ¶ 7.

[68] Doc. no. 30-1 (Deposition of Brenda Daniel), at 191.

[69] *Id.* at 191-92.

[70] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 45.

school's Principal, Debi Edwards, whom she described as an "awesome administrator."[71] Ms. Edwards's race is not specified in the record.

Plaintiff used the Kronos automated system to request a day of personal leave on January 15, 2015. Even though plaintiff had transferred to Hampton Cove by that date, the system still had her account linked to Westlawn, and it erroneously required Principal Alexander's approval for plaintiff's leave request. Principal Alexander denied plaintiff's request for leave because she had been informed by Hampton Cove's Principal, Debi Edwards, that plaintiff no longer needed to be off work on that date. Plaintiff acknowledged that the situation was appropriately addressed, and she did not lose any pay or receive a charge for a substitute teacher for that date.[72]

F.      **Plaintiff's Probationary Teacher Rubric Evaluation**

The Board's Talent Management Department annually reviews probationary teachers to determine whether they should be retained.[73] The Talent Management Department began using a standardized rubric to conduct the evaluations during the 2014-2015 school year. Pursuant to the rubric, teachers earned points in six different

---

[71] Doc. no. 30-1 (Deposition of Brenda Daniel), at 192.

[72] *Id.* at 205-08; doc. no. 30-14 (Affidavit of Presonia Lynette Alexander), ¶ 18; *id.* at Exhibit 2 (January 15, 2015 emails).

[73] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 6. An Alabama teacher achieves tenure "upon the completion of three complete, consecutive school years of full-time employment as a teacher with the same employer." Ala. Code § 16-24C-4(1). The employment of a probationary teacher can be terminated at any time, but a tenured employee has the right to a hearing before being terminated. Ala. Code §§ 16-24C-5(c), 16-24C-6(b).

areas of performance, with a total of 100 possible points.  The same factors were intended to apply to all probationary teachers who taught core subjects, but teachers of non-core subjects did not receive scores in all areas.  A teacher who received a score of 65 or above on the rubric would not automatically be recommended for termination.  If it was not possible for a teacher to be evaluated in all areas of the rubric, the teacher was scored by dividing the number of points received by the number of points available.  If any teacher received a score of less than 65%, she was recommended for termination.[74]

Review committees were formed to collect data, calculate scores, and make recommendations based upon the rubric.  The members of the review committees were not supposed to know the names of the teachers they were reviewing.  Instead, the names of the teachers were supposed to be redacted from all relevant documentation.  Each teacher was assigned an anonymous number, and only the employees of the Talent Management department knew the teacher names corresponding to the numbers.  Accordingly, if the rubric review process were applied successfully, the members of the review committee would not possess any personal or identifying information about the teachers they were reviewing, including race,

---

[74] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶¶ 8-10.  Even if a teacher scored 65 or above on the rubric evaluation, there might exist different reasons for recommending that the teacher be terminated, including failure to obtain certification, a surplus of teachers, an additional review by the Director of Instruction, or a temporary contract.  *Id.* ¶ 10.

gender, age, religion, or prior complaints.[75]  Each year, the Talent Management Department forwarded a list of teachers who did not score at least 65% on the rubric to the Board's Human Resources Department, and the Superintendent typically recommended that the Board terminate the employment of all teachers on the list.[76]

The committee that conducted plaintiff's probationary review on either March 4 or 5, 2015,[77] was comprised of five administrators from schools other than Westlawn and Hampton Cove, including:  Veronica Haley, a black female; Anne Jobe, a white female; Aaron King, a white male; Michael Morris, a black male; and Carolyn Williams, a black female.[78]  The first line of the rubric evaluation form contained the heading "DOCUMENTATION IN HR FILE," and asked the reviewers to "[p]lease check one of the following areas before beginning the Probationary Review Process."[79]  A box was checked next to the sentence, "There is documentation, but additional information is needed to make a decision about renewal."[80]  The documents attached to plaintiff's rubric were the disciplinary letters

---

[75] *Id.*, ¶¶ 11-14.

[76] *Id.*, ¶¶ 16-17.

[77] The rubric document states that it was completed on March 4, 2015.  Doc. no. 30-3, at ECF 91 (2014-2015 Probationary Teacher Review Rubric).  Even so, Aaron King and Anne Jobe both stated in their affidavits that they completed the rubric on March 5, 2015.  *See* doc. no. 30-9 (Affidavit of Aaron King), ¶ 6; doc. no. 30-11 (Affidavit of Anne Jobe), ¶ 8.

[78] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 28.

[79] Doc. no. 30-3, at ECF 91 (2014-2015 Probationary Teacher Review Rubric) (alteration supplied, capitalization in original).

[80] *Id.*

written by Principal Alexander while plaintiff was teaching at Westlawn. Plaintiff's name, Principal Alexander's name, and the name of the school were redacted from most of the letters, but one letter, though partially redacted, still contained plaintiff's name.[81] Two of the review committee members (both of whom are white) testified that they did not see plaintiff's name on any of the documents while conducting the rubric review.[82] There is no evidence indicating whether the three remaining members of the committee (all of whom were black) saw plaintiff's name. Plaintiff had written responses to most of Principal Alexander's letters, but her responses were not included with the rubric evaluation packet.[83] Lee Simons, the Director of Talent Management, testified that "[i]t was the practice of Talent Management only to include the written reprimands and not to include any rebuttals in the materials provided to the probationary review committee."[84]

1. **Teacher attendance**

The first area of review under the rubric was teacher attendance, for which as many as nine points could be awarded: *i.e.,* a teacher received nine points for zero to three absences during the school year; six points for four to six absences; three

---

[81] *Id.* at ECF 100-08. The letter containing plaintiff's unredacted name is reproduced on ECF page 107.

[82] Doc. no. 30-9 (Affidavit of Aaron King, a white male), ¶ 8; doc. no. 30-11 (Affidavit of Anne Jobe, a white female), ¶ 9.

[83] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 42.

[84] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 25 (alteration supplied).

points for seven to ten absences; and zero points for more than ten absences. Family and Medical Leave Act (FMLA) and professional leave days did not count as absences.[85] Plaintiff received six points for attendance, because she had been absent five days during the school year.[86]

## 2. Student discipline data

The second area, student discipline data, was worth a total of nine points, and was based upon the number of disciplinary referrals arising from the teacher's classroom. Each teacher received nine points for zero referrals, six points for one to five referrals, three points for seven to ten referrals, and zero points for more than ten referrals.[87] Plaintiff received all of the nine possible points because she had no disciplinary referrals.[88]

## 3. Student growth data

The third area was student growth data, for which fifteen points were possible. The student growth data scores were based upon the percentage by which students' standardized test scores increased between the beginning and middle points of the school year. A teacher earned fifteen points for an increase above 50%, ten points for an increase of 35-50%, five points for an increase of 20-34%, and zero points for an

---

[85] *Id.* ¶ 18.

[86] *Id.* ¶ 31; doc. no. 30-1 (Deposition of Brenda Daniel), at 225-26.

[87] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 19.

[88] *Id.* ¶ 32.

increase below 20%.[89]  Plaintiff received ten points for student growth data because her students' standardized test scores increased by 41% between the beginning and middle points of the school year.[90]  Even so, plaintiff disputes that her student growth data score was properly calculated, because she did not begin teaching at Westlawn until three weeks after the school year had started.[91]

### 4.     Principal input and recommendation

The fourth area of the rubric was labeled "principal input and recommendation," for which twenty points were possible.  Each teacher was reviewed by her *current* principal, who answered "yes or no" questions regarding the teacher's performance in six categories, then provided an overall recommendation regarding whether the teacher should be rehired.  A teacher who received a "yes" in all categories and a recommendation for rehire earned twenty points.  A teacher who received a rehire recommendation, but not a "yes" in all categories, earned twelve points.  A teacher who did not receive a rehire recommendation earned six points, regardless of how many "yes's" she or he also received.  Finally, a teacher who did not receive a rehire recommendation, and who also had documentation in her or his personnel file supporting the principal's decision not to give a rehire

---

[89] *Id.*, ¶ 20.

[90] *Id.*, ¶ 33.

[91] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 40.

recommendation, earned zero points.[92]  Debi Edwards provided plaintiff's principal input because she was plaintiff's principal at Hampton Cove Middle School on the date of the evaluation.  Principal Edwards did not consult Principal Alexander before she completed the principal input form, nor did she review any of the letters Principal Alexander had placed in plaintiff's personnel file.  Based upon Edwards' evaluation, plaintiff received all twenty possible points.[93]

Even though plaintiff's rubric evaluation form indicated that there was documentation in her personnel file, the two white members of the review committee testified that they did not review any of the letters in plaintiff's file.[94]  The record does not contain any testimony from the other three members of the review committee, all of whom are black.  Thus, it cannot be determined whether the other members reviewed the letters in plaintiff's file, but it is apparent that the committee did not deduct any points from plaintiff's principal input score because of those letters.

### 5.    Strategic Teaching Walkthrough

The fifth area of the rubric, worth a total of twenty points, was the "Strategic Teaching Walkthrough" of the teacher's classroom conducted during the second

---

[92] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 21.

[93] *Id.* at ¶ 34; doc. no. 30-15 (Affidavit of Debi Edwards), ¶ 6.

[94] Doc. no. 30-9 (Affidavit of Aaron King), ¶ 8; doc. no. 30-11 (Affidavit of Anne Jobe), ¶ 9.

semester by an administrator and a teacher from different schools.[95]   During the walkthrough, each teacher is given a score of 1-3 in various areas of strategic teaching, and all of the area scores are averaged to reach a composite score between 1 and 3.  A teacher earned all twenty possible points on the rubric if her composite score was between 2.4 and 3, fourteen points if her composite score was between 1.9 and 2.39, and seven points if her composite score was between 1.0 and 1.89.[96]  The walkthroughs for all teachers at Hampton Cove Middle School, including plaintiff, were conducted by teacher Ashley Rice and Anne Jobe, the Principal of Lee High School and a member of plaintiff's review committee team.[97]  The exact date of the walkthrough is disputed.  In one paragraph of her affidavit, Jobe stated that the walkthrough was conducted on February 5, 2015, but in another paragraph, she stated that it was conducted on February 2.[98]  The walkthrough document itself does not contain a date.[99]

Plaintiff received a composite score of 1.42 on her walkthrough evaluation, resulting in a total of only seven of the twenty points possible on this component of

---

[95] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 22.

[96] *Id.*, ¶ 26.

[97] *Id.*, ¶ 35.

[98] *Compare* doc. no. 30-11 (Affidavit of Anne Jobe), ¶ 7, *with id.*, ¶ 8.

[99] *See* doc. no. 30-3, at ECF 97-98 (Strategic Teaching Walkthrough).

the rubric.[100]  Plaintiff disputes most aspects of the walkthrough score.  For example, plaintiff received 1 out of 3 possible points for "Classroom is arranged to accommodate whole group instruction, teacher-led small group instruction and partner student work,"[101] but she asserts that she always had students seated in groups, and she used small groups and the "turn and talk" strategy in all of her lesson plans.[102]  She received 2 out of 3 possible points for "Materials:  Evidence exists of various materials being used to facilitate student engagement/learning."[103]  It was noted that plaintiff used the computer and other print materials, but she did not use textbooks, objects, or other visual aides.[104]  In response, plaintiff asserts that she could not have used textbooks in the classroom because Superintendent Wardynski had eliminated the use of textbooks in classrooms in all Huntsville City Schools.[105]  Plaintiff received 1 of 3 possible points for "Teacher Instruction:  Learning strategic instruction (before, during, and after strategies are used to introduce, define, or explain a concept; relate a concept to other concepts; assist students in recalling concepts; quality questioning, etc.").[106]  She responded that she *did use* the "before, during, and after" strategy, and

---

[100] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 35.

[101] Doc. no. 30-3, at ECF 97 (Strategic Teaching Walkthrough).

[102] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 32.

[103] Doc. no. 30-3, at ECF 97 (Strategic Teaching Walkthrough).

[104] *Id.*

[105] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 32.

[106] Doc. no. 30-3, at ECF 97 (Strategic Teaching Walkthrough).

even displayed it on her focus wall.[107]  Plaintiff received 1 of 3 possible points for "Evidence of differentiated strategic teaching (recognition of student needs, intentional grouping)."[108]  She responded by asserting that "it would have been illegal for me to identify special education students in class or to single them out."[109] Plaintiff received 1 of 3 possible points for "Posted or assigned student work that exhibits thinking about texts."[110]  She responded to that score by summarily stating that she had always met all the requirements for that category.[111]  Plaintiff received 1 of 3 possible points for "Students Actions:  Evidence of small-group or partner reading/writing/learning."[112]  Again, plaintiff responded by summarily stating that she "always incorporated those requirements in my classroom at Hampton Cove."[113]

### 6.     Student surveys

The sixth, and final, area of the rubric considered student surveys, which were conducted during the first semester and worth a total of twenty-seven points on the rubric.  Students "currently in class" rated the teacher either favorably or unfavorably in fifteen performance areas, and for each area, a total percentage of favorable

---

[107] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 32.

[108] Doc. no. 30-3, at ECF 97 (Strategic Teaching Walkthrough).

[109] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 33.

[110] Doc. no. 30-3, at ECF 97 (Strategic Teaching Walkthrough).

[111] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 34.

[112] Doc. no. 30-3, at ECF 97 (Strategic Teaching Walkthrough).

[113] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 35.

responses was calculated. The teacher received all twenty-seven points if 80-100% of the students' responses were favorable, eighteen points for 60-79% favorable responses, nine points for 40-59% favorable responses, and zero points for lower than 40% favorable responses.[114] Plaintiff's Westlawn students were surveyed during December of 2014 and gave favorable responses to only 59% of the questions. Accordingly, plaintiff received nine points on the student survey category.[115] Principal Alexander testified that school administrators were in charge of administering the student surveys while the teacher was out of the room, but she could not recall which one of the Westlawn administrators administered plaintiff's survey.[116] On the other hand, plaintiff stated that, in her experience, "it was up to the teacher to advise the students to go online and complete the survey, not a member of administration or the leadership team."[117] The student survey form stated the total number of students surveyed, but it did not state either the total number of students in plaintiff's Westlawn classes or the percentage of students who completed the survey.[118] Those omissions contradicted the rubric form, which stated that "[s]urveys

---

[114] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 24; doc. no. 30-3, at ECF 92 (2014-2015 Probationary Teacher Review Rubric).

[115] Id., ¶ 36; doc. no. 30-3, at ECF 99 (December 2014 Student Survey).

[116] Doc. no. 30-3 (Deposition of Presonia Lynette Alexander), at 176.

[117] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 38.

[118] Doc. no. 30-3, at ECF 99 (December 2014 Student Survey).

should indicate that the majority of students in all classes were surveyed."[119] Plaintiff's student surveys from the spring semester at Hampton Cove reflected a higher score that would have earned her eighteen points for that category on the rubric.[120]

### 7.    Plaintiff's total rubric score

Plaintiff's total score on the rubric was 61 out of 100, which was lower than the 65-point threshold, so the review committee did not recommend that she be retained for the 2015-2016 school year.[121]   Plaintiff's rubric had been evaluated under an anonymous teacher number up to that point, but after the review committee made its recommendation, the Talent Management Department matched plaintiff's anonymous teacher number with her name and placed her name on the list of probationary teachers who would be recommended for termination.[122]   The Talent Management Department forwarded that list to Human Resources "[n]ear the end of the 2014-15 school year," and Human Resources "included these employees in the list of employees to be recommended for termination by the Superintendent at the Board's May 20, 2015 meeting."[123]

---

[119] *Id.* at ECF 92 (2014-2015 Probationary Teacher Review Rubric) (alteration supplied).

[120] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 39; doc. no. 47-12.

[121] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 37.

[122] *Id.*, ¶¶ 38-39.

[123] Doc. no. 30-16 (Affidavit of Micah Fisher), ¶¶ 3-4 (alteration supplied).

## G.     Plaintiff's First EEOC Charge

Plaintiff filed her initial charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 26, 2015, alleging race and gender discrimination and retaliation.  She stated:

> I am a White female.  I was hired by the above-named employer on August 25, 2014 as a Math Teacher.  During my tenure I was subjected to harassment, a hostile work environment, intimidation, disparate terms and conditions of employment and discipline commencing September 26, 2014.  I received unlawful disciplinary actions September 26, 2014, October 22, 2014, October 29, 2014, a second discipline October 29, 2014, December 1, 2014 and December 19, 2014.  I was accused of not knowing my curriculum, accused of classroom deficiencies although no observation had been conducted, and accused of unprofessional tone and behavior.  The hostility was such that whenever I question a disciplinary action or attempted to address my concerns I was faced with intimidation by Principal Lynette Alexander and told not to speak.  The continued harassing treatment and the hostile work environment it created affected [my] ability to perform my job.

> I complained to the Alabama Education Associated [*sic*] (AEA) on September 26, 2014, and each time thereafter when I received an unlawful discipline.  The AEA representative Shirley Wellington addressed the School Superintendent and the Secondary Curriculum Coordinator on numerous occasions on my behalf to no avail.  On December 16, 2014, I submitted a written rebuttal addressing all disciplines to Superintendent Casey Wardynski.  Following the various complaints I was retaliated against resulting in further disciplines, removal from my assigned classroom effective January 5, 2015, and an involuntary transfer on January 12, 2015.  After the involuntary transfer, which I was required to sign, I was again subject to retaliatory treatment when my prior Principle [*sic*] denied my time-off and continued to charge me with time associated with placing a substitute teacher for my prior vacant classroom.  As a result of the involuntary transfer my pay

has been reduced, I am forced to drive one hour to work versus twenty-five minutes, and I am forced to pay for transportation to school for my children.

I believe I was discriminated against on the basis of my race, sex and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended. Similarly situated male employees and African-American employees, both male and female, are treated more favorable. [*sic*].

Doc. no. 30-2, at ECF 38-39 (March 26, 2015 EEOC Charge) (alteration supplied).

## H.    Plaintiff's Complaints of Harassment

The Board's Policy Manual is published on the Board's website, and a hard copy of the manual is retained at each school in a manner that is accessible to any employee.[124]  All new employees are required to review the Policy Manual during orientation, and all updates to the Policy Manual are electronically communicated to employees.[125]

The Policy Manual contains an anti-harassment policy prohibiting harassment on the basis of several protected characteristics, including race and participation in legally protected activity.  "Every employee is expected to uphold this policy and is responsible for maintaining a respectful and professional educational and work environment.  When proper notice is provided, the Board will immediately investigate allegations of unlawful harassment and will take appropriate disciplinary action

---

[124] Doc. no. 30-5 (Affidavit of Shirley Wellington), ¶ 6.

[125] *Id.*

where warranted."[126] The policy defines unlawful harassment as

> verbal, physical, visual, written, electronic or other conduct directed
> against any person or group, based upon characteristics or activities
> protected by federal or state law that has the purpose or effect of
> unreasonably interfering with an individual's working environment or
> work performance or creating an offensive, demeaning, or intimidating
> environment for that person or group of persons. To be unlawful, the
> conduct must be severe or pervasive, but the Board prohibits any such
> harassment.

Doc. no. 30-2, at ECF 67, ¶ 5.14.1.

The Board requires all employees who have been subjected to harassment to

report it immediately,[127] and in the following manner:

> Under no circumstances should an employee pursue resolution of
> a potential harassment situation through informal reporting only.
> Although employees are encouraged to work together to resolve
> differences, and while reports to first-line supervisors may be helpful,
> the Board cannot properly oversee and investigate a situation without
> proper notice in the manner set out below. Informal complaints to co-
> workers and reports to first-line supervisors will not comply with this
> policy and cannot provide notice to the Board of the problem.
> Employees MUST follow the complaint procedure set out below.

*Id.* at ECF 68, ¶ 5.14.3(b) (capitalization in original). The required complaint

procedure is as follows:

> a. *Persons Responsible For Receiving and Investigating Complaints*
> – The Superintendent is responsible for adjudicating complaints
> regarding unlawful harassment. The Superintendent designates
> the Compliance Office for receiving reports of alleged unlawful

---

[126] Doc. no. 30-2, at ECF 67, ¶ 5.14.

[127] *Id.* at ECF 68, ¶ 5.14.3(a).

harassment. All complaints should be voiced directly to the Compliance Office. The Compliance Office can be reached at (256) 428-6836. However, under no circumstances will an employee be required to present the complaint to the person who is the subject of the complaint, nor will the complaint be adjudicated by the person who is the subject of the complaint. Accordingly, if the complaint concerns the Compliance Office, the complaint may be made directly to the Superintendent, or if the Superintendent is the subject of the complaint, directly to the Board.

b.      *Complaint form, contents* — Complaints should be made in writing, signed by the complainant, and should fully describe the circumstances surrounding the alleged harassment. Harassment complaints that cannot be made in writing should be memorialized by the Compliance Office or other appropriate recipient of the complaint.

c.      *Investigation* — The Compliance Office and Superintendent will promptly investigate the complaint, review the results of any investigation with legal counsel or other appropriate officials, make any findings that are supported by the investigation, and recommend appropriate action based on these findings. The complainant will be informed of any action that is taken as a result of the investigation.

d.      *Review by the Superintendent and the Board* — A complaining party who is not satisfied with the investigation or resolution of the complaint may request that the Superintendent take additional or different action or present the complaint to the Board for its review and action. In such case, the Board will render a final decision as soon as practicable.

Doc. no. 30-2, at ECF 68-69, ¶¶ 5.15.4(a)-(d) (italics in original). The Board's policy

states that all harassment complaints and investigations must be kept confidential, and

retaliation for filing a complaint is prohibited.[128]

Despite the specific written requirements of the Board's policy, however, Superintendent Wardynski testified that a teacher's complaint about a principal "could go to any number of individuals," including the AEA representative, a Board member, the school's Director of Instruction, or the Board's Director of Compliance. Superintendent Wardynski testified that he met with AEA representatives on a monthly basis to discuss employees' complaints.[129]

Plaintiff, however, never reported any alleged harassment to the Compliance Director when she was at Westlawn.  Instead, she reported Principal Alexander's actions to Pat Miller, the HEA representative, and Shirley Wellington, the AEA representative, beginning on September 26, 2014.[130]  At Wellington's suggestion, plaintiff wrote rebuttals to each of the written reprimands Principal Alexander issued her.[131]  Wellington also advised plaintiff to send her rebuttals to Superintendent Wardynski, and she did so, but on a date that is not specified in the record.[132] Wardynski testified that he was required to approve all documents related to teacher performance or discipline before those documents were placed in the teacher's

---

[128] *Id.* at ECF 69, ¶¶ 5.14.5, 5.14.6.

[129] Doc. no. 30-4 (Deposition of Casey Wardynski), at 45-48.

[130] Doc. no. 30-1 (Deposition of Brenda Daniel), at 261-64.

[131] *Id.*

[132] Doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 43.

personnel file at the central office.[133]

By May 13, 2015, however, Shirley Wellington had ceased to be the AEA representative for the Board's teachers, and had become the Board's Director of Compliance.[134]  Even so, plaintiff decided to send Wellington an email about Principal Alexander's treatment of her on that date, because she was prompted to do so by another former Westlawn teacher.[135]  The email stated:

> Shirley,
>
> I have several things that keep happening to me even after I was transferred to Hampton Cove.
>
> 1) The week I started at Hampton Cove, Lynnette [*sic*] Alexander charged me for a sub every day in Aesop (was this done so it would look like I had an excessive number of absences to insure I wouldn't be eligible for re-hire)[.]
>
> 2) I entered in Kronos a personal day (which was approved by Dr. Edwards) for a date in February and Lynnette [*sic*] Alexander denied my request[.]
>
> 3) My access to SchoolNet/Digits was so screwed up it took almost a week for SchoolNet/Pearson to figure out how to fix it so I could access the curriculum so I could begin teaching at Hampton Cove. . . it was so messed up the local tech people couldn't figure it out[.]
>
> 4) My access to iNow was once again so messed up it took several people in the tech office to figure out how to fix it

---

[133] Doc. no. 30-4 (Deposition of Casey Wardynski), at 70-75.

[134] Doc. no. 30-5 (Affidavit of Shirley Wellington), ¶¶ 1, 8.

[135] Doc. no. 30-1 (Deposition of Brenda Daniel), at 265-66.

so I could even log in[.]

5) My password into STAR was changed so I couldn't access my data for the spring testing which made me late reporting my data (making me look bad but fortunately Dr. Edwards understood)[.]

6) My Educate Alabama information was unassigned to any district in Alabama (I talked with the State Dept. of Education and the only people with access to unassign an account are principals and the superintendent. I don't think Dr. Wardynski did it and I asked Dr. Edwards and she said she did not do it)[.] I had a couple pieces of evidence that I had to re-enter. I was able to re-enter the information and close out my Educate Alabama on time without any problems. But what if I hadn't looked to finish one last piece of evidence? I wouldn't have been able to complete my paperwork that is required by the deadline. I do know that Lynette Alexander was in the Educate Alabama entering teacher's [*sic*] evals on the weekend before I checked my profile on Monday.

I fully understand that items 3-6 are circumstantial but very co-incidental. I am very worried about my re-hire status can you give me any reassurance I will be ok?

Doc. no. 30-2, at ECF 65 (May 13, 2015 Email) (alterations supplied).

Wellington responded by informing plaintiff that she no longer was the AEA representative, but noted that she had forwarded plaintiff's email to the current AEA representative, as well as to Pat Miller, the HEA representative.[136] Wellington did not communicate plaintiff's concerns to anyone else, including Superintendent

---

[136] Doc. no. 30-2, at ECF 64 (May 13, 2015 Emails).

Wardynski.  She explained her failure to do so as follows:

> It did not appear from the e-mail that there was anything for me to do.
> The issues she raised had been resolved and she was no longer serving
> as a teacher at Westlawn.  I could not give her any information about
> whether she would be terminated as I was not part of the probationary
> review process.

Doc. no. 30-5 (Affidavit of Shirley Wellington), ¶ 8.

## I.     Plaintiff's Termination

Superintendent Wardynski routinely relied upon the recommendations made

through the probationary rubric review process, without conducting independent

investigations, when deciding which probationary teachers to recommend for

termination.[137]   In accordance with that routine practice, when plaintiff's name was

placed on the Human Resources report of probationary teachers to be terminated in

May 2015, Superintendent Wardynski recommended to the Board that plaintiff be

terminated, without independently reviewing her file.[138]   The Board voted to approve

all terminations recommended by Dr. Wardynski, including plaintiff's, during its May

20, 2015 meeting.[139]

## J.     Christie Finley's May 20, 2015 Email

Christie Finley, the Director of Secondary Programs and the direct supervisor

---

[137] Doc. no. 30-13 (Affidavit of Casey Wardynski), ¶ 12.

[138] *Id.*, ¶ 13.

[139] Doc. no. 30-16 (Affidavit of Micah Fisher), ¶ 6.

of all principals, including Principal Alexander, sent an email to Barbara Cooper, the

Assistant Superintendent, on May 20, 2015, with the subject line "Info requested,"

and reading, in its entirety:

- Requesting people she knows for TOSA –

  - Summer School Administrator – Continued to tell secondary she wanted a certain teacher to be the administrator. This person did not have admin certification and yet she continued to ask for her.

- *Hostile Work Environment*

  - Amy Van Allen
  - *Brenda Daniel – district personnel had to meet with teacher and move her to another school*
  - Elizabeth Bates – personnel issue – has continued to contact Mrs. Finley and has made contact with Shirley Wellington last semester and this past month.

- Yearbooks – copyright issue and question of when the yearbooks were ordered

- STAR Issue in January – LA departmentalized 6th grade after the first STAR test. Did not inform anyone so when Dr. McNeal tried to calculate scores, she was unable to do so, because the students were not linked to the original teachers. The issue — kept the school from being to calculate if they earned the incentive for the first semester.

Doc. no. 47-2 (May 20, 2015 Email) (emphasis supplied). There is no further

discussion of this email anywhere in the record.

**K.    Plaintiff's Alleged Comparator**

Plaintiff identified her primary comparator as Jacqueline Willis, a black probationary math teacher at Westlawn.[140] When Education Company consultant Dr. Shirley Kilgore observed Willis on November 19, 2014, she observed that Willis "lets kids step in hallway," was "[v]ery loud in classroom," and had "[n]o classroom control."[141] She also noted that Willis was "[o]blivious to all," "trying to do whole group the same way she is doing small group," and "occupying the students rather than engaging them."[142] Even so, Principal Alexander did not issue any written discipline to Willis until March 19, 2015, when she stated:

> Several conferences have been held to discuss your lack of classroom management and low student engagement. Prior to this letter, expectations for student engagement have been communicated, and instructional support has been provided throughout the year. Additional personnel have been scheduled into your classroom in order to assist you in maintaining order so that instruction is possible.
>
> Nevertheless, the following deficiencies are still evident:
>
> 1.  Teacher is not addressing student behaviors.
> 2.  Student behaviors hinder the classroom instruction and instructional pacing is lacking.
> 3.  Classroom routines and procedures are not evident and teacher is not implementing the 5-Step Behavior Plan.
>
> The consultant from Education Company comments also supported our findings by stating that teacher ignores student behaviors and the teacher teaches over off-task behaviors. The consultant also

---

[140] *See* doc. no. 47-1 (Declaration of Brenda Daniel), ¶ 30.

[141] Doc. no. 30-3, at ECF 114 (Education Company Meeting Notes) (alterations supplied).

[142] *Id.* at ECF 117 (alteration supplied).

noted that the teacher is not using the Behavior Log and the classroom lacked routines and procedures.

Your unwillingness to address student behaviors and the existence of low expectations are hindering the effectiveness of your lessons. Off-task and disruptive behaviors must be addressed immediately and the 5-Step Discipline Plan must be consistently implemented. Classroom management plan must include a daily commitment to routines and procedures. This letter will be placed in your Human Resources file.

Doc. no. 47-5, at ECF 32 (March 19, 2015 Letter).

Willis's employment with the Board was not terminated at the end of the 2014-2015 school year.[143] Lee Simmons testified that Willis was not recommended for termination because she scored more than 65 on the rubric evaluation.[144] Plaintiff asserts that Willis never was subjected to the rubric evaluation, but the only evidence she cites to support that assertion is a three-page list of employees on which Willis's name does not appear.[145] Plaintiff's evidentiary submission did not explain where that list originated, or even exactly what it purports to list, but defendants explained in their reply submission that plaintiff's exhibit actually is a list of probationary employees who were terminated at the end of the 2014-2015 school year.[146] Willis's name is not on that list because her employment was not terminated.

---

[143] *See* doc. no. 30-16, at ECF 13 (including Ms. Willis's name on the list of teachers to be retained).

[144] Doc. no. 30-6 (Affidavit of Lee Simmons), ¶ 41.

[145] Doc. no. 47-7.

[146] *See* doc. no. 50-1 (attachment to Defendants' Reply Brief).

**L.    Plaintiff's Second EEOC Charge and Complaint**

Plaintiff filed a second EEOC charge on May 26, 2015, alleging that the termination of her employment was in retaliation for filing her first EEOC charge. Specifically, plaintiff stated:

> I was hired by the above name[d] employer on or about August 25, 2014, as a Math Teacher.  On or about March 26, 2015, I filed a charge of discrimination with the EEOC (EEOC Charge Number 420-2015-01385).  On or about May 20, 2015, I was discharged; however, Jacqueline Willis (Black) and Kerri-Ann Warren (Black) were not discharged.
>
> I believe that I have [been] retaliated against for my protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Doc. no. 30-2, at ECF 61 (May 26, 2015 EEOC Charge) (alterations supplied).

The EEOC issued a Dismissal and Notice of Rights with regard to both charges on October 2, 2015.[147]  Plaintiff filed this suit on November 30, 2016, more than ninety days later.[148]  Accordingly, she asserted her federal claims under only 42 U.S.C. §§ 1981 and 1983, not Title VII of the Civil Rights Act of 1964, as amended. *See* 42 U.S.C. § 2000e-5(f)(1) (stating that a civil lawsuit must be filed within ninety days of receipt of a right-to-sue letter from the EEOC).

### III. DISCUSSION

---

[147] Doc. no. 30-2, at ECF 62-63.

[148] *See* doc. no. 1 (Complaint).

## A.    Race Discrimination

Plaintiff claims that her transfer to Hampton Cove, as well as her termination, were the result of unlawful race discrimination. She does not claim to have direct evidence of a race-based discriminatory animus that motivated either action. Therefore, she must prove her claims with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981). Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which gives rise to a presumption of discrimination. To rebut the resulting presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

> To establish a prima facie case for disparate treatment in an employment discrimination case, the plaintiff must show that: "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange Cty.,* 447 F.3d 1319, 1323 (11th Cir. 2006).

*Trask v. Secretary, Department of Veterans Affairs*, 822 F.3d 1179, 1192 (11th Cir. 2016). There is no dispute that plaintiff belonged to a protected class, that she was qualified to perform the duties of her teaching position, or that the *termination* of her employment was an adverse employment action. Accordingly, the only *prima facie* elements remaining for the court's consideration are whether plaintiff's *transfer* was an adverse employment action, and whether similarly situated black employees were treated better than plaintiff.

### 1. Transfer

The parties dispute whether plaintiff's transfer to Hampton Cove was voluntary or involuntary, but even accepting plaintiff's argument that the transfer was forced upon her, it was not an adverse employment action. "In a Title VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility." *Hinson v. Clinch County, Georgia Board of Education*, 231 F.3d 821, 829 (11th Cir. 2000) (citing *Doe v. Dekalb County School District*, 145 F.3d 1441, 1448 (11th Cir.1998)). The court must employ "an objective test, asking whether 'a reasonable person in [the plaintiff's] position would view the employment action in question as adverse.'" *Hinson,* 231 F.3d at 829 (citing *Doe,* 145 F.3d at 1449) (alteration in original).

Here, the amount paid to plaintiff by the Board was not reduced as a result of

her transfer, and her responsibilities as a middle school math teacher were the same at both schools. She asserts that the transfer was an adverse employment action because Hampton Cove was further from her home, and the assignment caused her to place her own children in day care and pay for their transportation to and from school. The court does not accept those arguments, however, because other district courts have held, in well-reasoned and persuasive opinions, that such consequences are best characterized as inconveniences, as opposed to material changes in a plaintiff's employment status. One such court is the Middle District of Alabama, which held in *Evans v. Alabama Department of Corrections*, 418 F. Supp. 2d 1271 (M.D. Ala. 2005) (Thompson, J.), that:

> Evans's transfer from Alexander City has required that he commute 100 miles, round trip, from his home to another facility in Deatsville, Alabama. Previously, Evans lived and worked in Alexander City; however, Evans has maintained the same salary, rank, and benefits as before. "Transfers that have required moving from one city to another have been held [to] not be actionable where the transfer did not involve a change in salary, benefits, or any other aspect of employment. Where the changed work location does not even require one to change residences, these transfers generally merely create an inconvenience, which for purposes of Title VII is not actionable." *Baker v. Alabama Dep't of Public Safety*, 296 F. Supp. 2d 1299, 1308 (M.D. Ala. 2003); *see also Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998) (no adverse employment action and only a "mere inconvenience" where transfer of plaintiff's employment increased commute time from between five and seven minutes to between 30 and 40 minutes); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir. 1989) (no materially adverse change in terms or conditions of plaintiff's employment where transfer of position meant that the more-than-65-

year-old plaintiff would have to travel farther from home to get to work); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1136 (N.D. Ga. 2004) ("[A]n overwhelming number of federal courts have held that a reassignment or transfer which results in an increased commute, without more, is not objectively serious and tangible enough to meet the threshold of substantiality.").

*Evans*, 418 F. Supp. 2d at 1276 (first alteration supplied, second alteration in original).

Plaintiff also asserts that she lost job security as a result of the transfer. She relies upon the October 16, 2014 agreement stating that she would be paid a specified hourly rate for up to five hours of additional work each week during "Extended Learning Time."[149]   Contrary to plaintiff's assertion, however, no reasonable interpretation of that agreement could lead to the conclusion that she "had an expectation of being able to stay at Westlawn for three (3) years from August 26, 2014 to May 27, 2017 working under the SIG grant funding."[150]   There is no indication that the agreement was intended to alter the general rule that an Alabama teacher remains on probationary status for her first three years at a given school. Indeed, the agreement did not guarantee plaintiff a minimum number of Extended Learning Time hours, and it stated that it could be terminated by either party with five

---

[149] See the discussion in Part II.A., *supra*.

[150] Doc. no. 46 (Plaintiff's Response in Opposition to Defendants' Motions for Summary Judgment), at 43.

days' written notice.[151]   Thus, the only reasonable expectation that plaintiff could have entertained, based upon the terms of that agreement, was to be paid the specified rate for each hour of Extended Learning Time instruction she expended.   The agreement did not provide her a guarantee, or even an enhanced expectation, of continued employment.

Because plaintiff cannot demonstrate that her transfer was an adverse employment action, her discriminatory *transfer* claim must fail, and there is no need to evaluate whether similarly situated black employees were treated more favorably with regard to the transfer claim.

## 2.   Termination

To succeed on the remaining element of her discriminatory *termination* claim, plaintiff must demonstrate that similarly situated black employees were treated more favorably than her.   "'To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant respects.'" *Lewis v. City of Union City*, 877 F.3d 1000, 1015 (11th Cir. 2017) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) (in turn citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997))).

---

[151] *See* doc. no. 47-9 (Agreement), the full text of which is quoted in part II.A., *supra*.

Plaintiff asserts that Jacqueline Willis, a black probationary math teacher at Westlawn, was retained despite having a record of performance problems similar to her own. It is true that Willis, like plaintiff, received negative comments from Education Company consultant Dr. Shirley Kilgore on November 19, 2014. Even so, those comments were not the same ones plaintiff received, and Dr. Kilgore did not indicate, as she did with plaintiff, that Willis was beyond hope. Moreover, Willis received only one writeup in her Human Resources file, while plaintiff received several. Finally, although plaintiff asserts that Willis did not have to undergo the rubric evaluation before her employment was renewed at the end of the 2014-2015 school year, there simply is no evidence to support that assertion. Plaintiff alleges that her "Exhibit 7," a list of employee names and "review numbers," establishes that Willis was not subjected to the rubric, but it is impossible to determine anything about the contents or significance of that document from its face. That exhibit, standing alone, proves nothing, and plaintiff has not offered any additional evidence that the exhibit is what she says it is. Defendants, on the other hand, have explained that the document actually is a list of probationary employees who were terminated at the end of the 2014-2015 school year, and that Willis's name was not on the list because she was not terminated.

Other than the fact that they both were math teachers at Westlawn, plaintiff and

Willis do not have much in common.  Because plaintiff has not identified a similarly situated black comparator who was treated more favorably than her, she cannot satisfy her *prima facie* case of race-based discriminatory termination.  Even so, she asserts that evidence "that she was systematically treated more adversely than a similarly situated black employee, suffices to establish a convincing  mosaic of circumstantial evidence."[152]  Indeed, the Eleventh Circuit has held that

> "[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.  Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011).  Even without similarly situated comparators, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.
>
> This, of course, is perfectly logical.  Not every employee subjected to unlawful discrimination will be able to produce a similarly situated comparator.  Among other things, a proper comparator simply may not exist in every work place.  Accordingly, a "plaintiff will always survive summary judgment if he presents . . . 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'" *Id*. (quoting *Silverman v. Bd. of Educ. of City of Chi*., 637 F.3d 729, 734 (7th Cir. 2011), *overruled by Ortiz v. Werner Enters*., Inc., 834 F.3d 760 (7th Cir. 2016) (footnote omitted)).  A "convincing mosaic" may be shown by evidence that demonstrates, among other things, (1) "suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent might be

---

[152] Doc. no. 46 (Plaintiff's Response in Opposition to Defendants' Motions for Summary Judgment), at 45.

drawn," (2) *systematically better treatment of similarly situated employees*, and (3) that the employer's justification is pretextual. *Silverman*, 637 F.3d at 733-34 (quotations omitted).

*Lewis*, 877 F.3d at 1018 (emphasis supplied, alterations in original).

Other than a summary reference to Willis's allegedly better treatment, plaintiff does not describe the convincing mosaic of circumstantial evidence that allegedly supports her discriminatory termination claim. As discussed above, there is little evidence that Willis was treated better than plaintiff, and there certainly is no evidence that she or any other black employees were *systematically* treated better.

Absent satisfaction of the *prima facie* case, or any other evidence of discriminatory intent, plaintiff's discriminatory termination claim must fail.

## B.    Retaliation

Plaintiff also asserts that her transfer and termination were the result of unlawful retaliation. "Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents,* 212 F.3d 571, 586 (11th Cir. 2000), *overruled on other grounds by Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006). A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation: she engaged in statutorily protected expression; she suffered an adverse employment action; and, there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Shannon v. BellSouth*

*Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

> Once plaintiff establishes a prima facie case [of retaliation] by proving only that the protected activity and the negative employment action are not completely unrelated, the burden shifts to the defendant to proffer a legitimate reason for the adverse action . . . . The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the "legitimate" reason is merely pretext for prohibited, retaliatory conduct.

*Sierminski v. Transouth Financial Corporation*, 216 F.3d 945, 950 (11th Cir. 2000) (citations omitted, alteration supplied).

### 1. Transfer

Plaintiff filed her first EEOC charge on March 26, 2015, more than two months *after* she was transferred to Hampton Cove. Thus, the transfer could not have been in retaliation for filing the charge. The only time plaintiff complained of *race-based* harassment prior to her transfer was during November 2014, when she told Pat Miller, the HEA representative, that Principal Alexander was targeting her because she was white. Pat Miller is not an employee of the Board, and there is no evidence that he related plaintiff's complaints of race discrimination to *any* Board employee, much less an employee with authority to effect plaintiff's transfer.

Plaintiff asserts, nevertheless, that the May 20, 2015 email from Director of Secondary Programs Christie Finley to Assistant Superintendent Barbara Cooper constitutes circumstantial, if not direct, evidence that her "race and her claim of racial

'hostile work environment' were the reason for the transfer."[153]  However, the email merely states, under the heading "Hostile Work Environment":  "Brenda Daniel – district personnel had to meet with teacher and move her to another school."[154]  There is no mention of race discrimination, and no indication that the hostile environment referred to was based upon plaintiff's race.  Because there is no evidence that plaintiff complained of *race-based* harassment prior to her transfer, she cannot satisfy the first element of her *prima facie* case for retaliatory transfer.  *See Coutu v. Martin County Board of County Commissioners,* 47 F.3d 1068, 1074 (11th Cir. 1995) (holding that a complaint of "[u]nfair treatment, absent discrimination based on race, sex, or national origin," does not constitute statutorily protected activity) (alteration supplied).

### 2.  Termination

As discussed in the previous section, plaintiff did not engage in any protected activity until she filed her EEOC charge on March 26, 2015.  Her termination on May 20, 2015, less than two months later, clearly was an adverse employment action.  Thus, the only remaining element of her *prima facie* case is a causal connection between the protected activity and the adverse employment action.  The temporal

---

[153] Doc. no. 46 (Plaintiff's Response in Opposition to Defendants' Motions for Summary Judgment), at 48.

[154] Doc. no. 47-2 (May 20, 2015 Email).

proximity between plaintiff's EEOC charge and her subsequent termination ordinarily would be sufficient to establish a causal connection. *See Robinson v. LaFarge North America, Inc.,* 240 F. App'x 824, 828-29 (11th Cir. 2007) ("Robinson established a prima facie case [of retaliation], as the demotion occurred only about two months after he filed a grievance.") (alteration supplied); *Berman v. Orkin Exterminating Co., Inc.,* 160 F.3d 697, 702 (11th Cir. 1999) (holding that the plaintiff established a *prima facie* case of retaliation when the adverse employment action "occurred within a couple months of the [plaintiff's] complaint") (alteration supplied).

Here, however, defendants assert that the decision to terminate plaintiff's employment actually was made during the rubric review process, *before* plaintiff filed her EEOC charge. It is disputed whether plaintiff's rubric evaluation was completed on March 4 or March 5, 2015, but in either event, it was completed *before* her EEOC charge was filed. It is true that the list of employees who failed the rubric evaluation was not forwarded to Human Resources, and then to the Superintendent for termination recommendations to the Board, until closer to the end of the school year, very likely after plaintiff's EEOC charge was filed. Even so, the termination recommendations were based upon the probationary teachers' rubric scores, which, at least in plaintiff's case, were calculated prior to the date of the charge. Therefore, even though the final, formal decision to terminate plaintiff's employment was not

made until after the date on which she filed an EEOC charge, the events that set the termination decision in motion occurred before the charge filing date. Thus, the temporal proximity between the filing of the charge and the subsequent termination is not sufficient to establish a causal connection. Consequently, plaintiff cannot establish a *prima facie* case of retaliation, and summary judgment is due to be granted in defendants' favor on plaintiff's retaliatory termination claim. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation."); *Thomas v. Department of Corrections for Georgia*, 377 F. App'x 873, 882 (11th Cir. 2010) ("[T]here is no requirement that, in order to show the absence of a causal connection, an employer must show that it formally initiated an adverse action before the employee engaged in protected activity.") (alteration supplied).

## C.  Hostile Work Environment

Plaintiff asserts that defendants have admitted the existence of a hostile work environment. She relies upon the May 20, 2015 email from Christie Finley to Barbara Cooper, stating, under the heading "Hostile Work Environment": "Brenda Daniel – district personnel had to meet with teacher and move her to another

school."[155]  That email might demonstrate that plaintiff had made *complaints* of a hostile work environment, but it does not constitute an admission by defendants that a hostile work environment actually existed.  Moreover, as discussed above, the email does not mention harassment *because of plaintiff's race.*

Thus, plaintiff must provide proof of five elements in order to establish a *prima facie* racially-hostile work-environment claim:  (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon her race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatory abusive working environment; and (5) her employer is liable for the environment under a theory of either direct or vicarious liability.  *See, e.g.*, *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).

Plaintiff has acknowledged that Principal Alexander did not make any race-based comments to her or in her hearing.  Instead, she asserts that Principal Alexander subjected her to the following harassing acts:  (1) "false write-ups designed to communicate her lack of effectiveness as a teacher, as established by her rebuttals"; (2) "a walk-through on the only day that it would have been impossible for her to comply with the requirements of the walk-through due to the Board's requirement of

---

[155] *Id.*.

the use of the classroom that morning for the Explore tests"; (3) "Alexander raised her hand twice in the meeting with Plaintiff such that Plaintiff thought she was going to be physically struck"; (4) "Principal Alexander and Counselor McCloud[] made fun of her in front of students after Principal Alexander had decided to remove her students"; (5) "[s]he was not provided help with difficult students, despite having repeatedly asked for help"; and, (6) "[h]er assignments were removed and her students were taken away from her, among many other adversities administered by Defendant Alexander."[156]

There is no apparent connection between any of these incidents and plaintiff's race. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . *because of* . . . [race].'" *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 80 (1998) (emphasis and ellipses supplied, first alteration in original, second alteration supplied); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1253 (11th Cir. 1999) ("Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace.") (Edmondson, J., concurring). The "'critical issue,'" according to the Supreme Court, "'is whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed.'"

---

[156] Doc. no. 46 (Plaintiff's Response in Opposition to Defendants' Motions for Summary Judgment), at 61 (alterations supplied).

*Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)) (alterations supplied). Stated somewhat differently,

> [t]he essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion. . . . In proving a claim for a hostile work environment due to [racial] harassment, therefore, the plaintiff must show that *but for the fact of her* [*race*], she would not have been the object of harassment. . . .

*Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982) (citations omitted) (emphasis and alterations supplied). "[U]nfair treatment of an employee, standing alone, does not make out a Title VII case; *the mistreatment must be because the employee was* [*white*]." *Bell v. Crackin' Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part) (emphasis and alterations supplied).

Furthermore, personal conflicts between two employees cannot serve as the basis for a Title VII claim if they do not arise from the aggrieved employee's membership in a protected classification. "'Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of [race] discrimination. . . . The plaintiff cannot turn a personal feud into a [race] discrimination case. . . .'" *Succar v. Dade County School Board*, 229 F.3d 1343, 1345 (11th Cir. 2000) (*per curiam*) (quoting *McCollum v. Bolger*, 794 F.2d

602, 610 (11th Cir. 1986)) (alterations supplied, ellipses in original). Regardless of the factual context in which the employees' dispute arises, the court's analysis of a Title VII harassment claim should focus "only on whether the complaining employee was targeted *because of*" her membership in a protected class. *Succar*, 229 F.3d at 1345 (emphasis supplied).

At best, the actions of which plaintiff complains reflect Principal Alexander's attempts to improve plaintiff's job performance, or, at worst, a personality conflict between plaintiff and Principal Alexander. The mere fact that plaintiff and Principal Alexander are of different races does not transform either the two individuals' personality conflict or plaintiff's disagreement with Principal Alexander's treatment of her into a race discrimination claim. Plaintiff's arguments to the contrary are unavailing. She states:

> Alexander only called in white employees on September 26, 2014, after her rant-laden presentation threatening termination of employees. The email in which hostile working environment claims are pointed out by Finley are those of only white employees. Jacqueline Willis, African-American math teacher, was not written up during the fall of 2014, despite the consultant's very negative assessment of her, while Plaintiff was written up six times, had her assignments removed and was eventually forcibly transferred.

Doc. no. 46 (Plaintiffs' Response in Opposition to Defendants' Motions for Summary Judgment), at 62. As an initial matter, these assertions only pertain to the first and third alleged instances of harassment identified by plaintiff (*i.e.,* write-ups and the

September 26 meeting with Principal Alexander).  Plaintiff has not offered any argument or evidence why the other incidents should be considered race-based.

Additionally, the evidence does not support plaintiff's arguments.  First, plaintiff's testimony that she only *heard* the names of white teachers being called into private meetings with Principal Alexander on September 26 does not refute Principal Alexander's testimony that she met with both white and black teachers.  Second, as has been previously discussed, the May 20, 2015 email does not identify any alleged hostile work environment as being based upon race, and it does not constitute evidence that a hostile work environment existed, only that complaints had been made.  Third, there is no indication that Jacqueline Willis deserved to receive as many write-ups as plaintiff, or that the Education Company consultant's remarks regarding Willis were as severe as the ones she made about plaintiff.

Absent any evidence of race-based harassment, plaintiff's hostile work environment claim must fail.

**D.    Tortious Interference**

This court's jurisdiction over plaintiff's state law claim against Principal Alexander for tortious interference with plaintiff's employment was based upon 28 U.S.C. § 1367.  In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are

"supplemental" to the federal claim.  *See* 28 U.S.C. § 1367(a).  Even so, the district court may decline to exercise supplemental jurisdiction when:

> (1)    the claim raises a novel or complex issue of State law,
>
> (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3)    *the district court has dismissed all claims over which it has original jurisdiction*, or
>
> (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (alteration and emphasis supplied). The Supreme Court added a gloss to this statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50 (alteration and emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent [now *supplemental*] jurisdiction doctrine — judicial economy,

-72-

convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7 (alterations supplied); *see also L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages *or even requires* dismissal of state claims") (emphasis supplied).

Here, because all of plaintiff's federal claims have been eliminated, this court will decline supplemental jurisdiction over the remaining state law claim, and will exercise its discretion to dismiss that claim.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, it is ORDERED that defendants' motions for summary judgment are GRANTED. Plaintiff's claims for race discrimination, retaliation, and hostile work environment pursuant to 42 U.S.C. §§ 1981 and 1983 are DISMISSED with prejudice. Plaintiff's state law claim for tortious interference is DISMISSED without prejudice to plaintiff's right to refile the claim in an appropriate state court. Costs are taxed to plaintiff. The Clerk is directed to close this file.

DONE this 11th day of April, 2018.

United States District Judge